UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CARLOS ALEXIS GARCIA,           :
    Plaintiff,              :
                      :
    v.                      :      Case No. 3:18-cv-1226 (SRU)
                      :
COMMISSIONER SCOTT SEMPLE, et al.,   :
    Defendants.             :

## INITIAL REVIEW ORDER

Carlos Alexis Garcia ("Garcia"), is incarcerated at MacDougall-Walker Correctional

Institution ("MacDougall-Walker"). He has filed a civil rights complaint pursuant to 42 U.S.C. §

1983 regarding incidents that occurred at Enfield Correctional Institution ("Enfield") from

February 17, 2016 to March 4, 2016. *See* Compl., Doc No. 1, at 5–30. He names twenty-four

employees of the State of Connecticut Department of Correction and one Connecticut State

Trooper as defendants. *See id.* at 1–5. For the reasons set forth below, the complaint is

dismissed in part.

## I.    Standard of Review

Under Section 1915A of Title 28 of the United States Code, I must review prisoner civil

complaints and dismiss any portion of the complaint that is frivolous, malicious, or fails to state a

claim upon which relief may be granted, or that seeks monetary relief from a defendant who is

immune from such relief. 28 U.S.C. § 1915A. Although detailed allegations are not required,

the complaint must include sufficient facts to afford the defendants fair notice of the claims and

grounds upon which they are based and to demonstrate a plausible right to relief. *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 555–56 (2007). Conclusory allegations are not sufficient. *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief

that is plausible on its face." *Twombly*, 550 U.S. at 570. Nevertheless, it is well-established that "[p]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

## II.    Facts

On February 17, 2016, Correctional Officer Lizon searched Garcia's cell and discovered a box in the radiator that contained numerous items of contraband including homemade needles and sharpened tools for engraving and modifying electronics. *See Compl.* at 6 ¶ 33 & Ex. 2 at 37–38. Officer Lizon charged Garcia with the disciplinary offense of Contraband, Class A. *See id.* Custody Supervisor Scagliarini signed off on the disciplinary report. *See id.* ¶ 34. Captain Rios determined that Garcia's presence in the general population posed a serious threat to the security of other inmates and the facility and issued an order that Garcia be placed on administrative detention pending the disposition of the disciplinary report for contraband. *See id.* ¶ 32 & Ex. 1 at 35–36. He directed officers to escort Garcia to a cell in the restrictive housing unit. *See id.* ¶ 32. Garcia received a copy of the disciplinary report later that evening. *See id.* ¶ 35.

The following day, February 18, 2016, Disciplinary Investigator Gottlieb interviewed Garcia regarding the disciplinary report. *See id.* at 7 ¶ 36. Garcia did not deny that the contraband items belonged to him. Instead, he argued that the items constituted Contraband, Class B items, rather than Contraband, Class A items. *See id.* ¶ 37. Investigator Gottlieb refused to reduce the charge to contraband B. *See id.* ¶ 38. He encouraged Garcia to plead guilty and

accept sanctions of seven days' of punitive segregation, thirty days' loss of commissary privileges, fifteen days' loss of recreation privileges and fifteen days' forfeiture of risk reduction earned credit, rather than risk the imposition of more significant sanctions if he were found guilty after a hearing on the disciplinary charge. *See id.* Garcia was aware that a plea of guilty to a Class A offense would also result in the loss of contact visits with his family for two years. *See id.* Garcia chose to plead guilty to the charge of Contraband, Class A and signed the guilty plea section of the disciplinary report in the presence of Investigator Gottlieb. *See id.* ¶ 39 & Ex. 3 at 39–40.

On February 24, 2016, Garcia completed his confinement in punitive segregation and Investigator Gottlieb escorted him to a cell in general population. *See id.* at 8 ¶¶ 42–43. At approximately 1:45 p.m. on February 25, 2016, Officers Atkins and Hazelett informed Garcia that he must accompany them to the administrative building pursuant to the order of Lieutenant Earley. *See id.* ¶¶ 44–45.

During Garcia's escort to the administrative building, Officer Valierre informed Garcia that he would be searching his cell and would be removing any unauthorized items. *See id.* at 9 ¶ 46. A few minutes after reaching the administrative building, Lieutenant Earley arrived with Intelligence Coordinator Rodriguez, Investigator Gottlieb and K-9 Handler Jane Doe. *See id.* ¶ 48. As Officers Valierre, Atkins and Hazelett "converge[d]" on Garcia, Lieutenant Earley ordered Garcia to place his hands behind his back. *See id.* ¶¶ 48–49. Instead of putting his hands behind his back, Garcia attempted to ask Lieutenant Earley some questions. Lieutenant Earley then took a cannister containing a chemical agent out of his pocket, assumed a "threatening stance" and issued another order directing Garcia to place his hands behind his back

3

to be handcuffed. *See id.* ¶ 50. Garcia placed his hands behind his back and officers placed the handcuffs on his wrists. *See id.* at 9–10 ¶¶ 51–52. After being handcuffed, Garcia asked Lieutenant Earley why he was being "detain[ed]. *See id.* at 10 ¶ 52. Lieutenant Earley told Garcia to relax. *See id.* During Garcia's escort from the administrative building to the medical department, officers exerted pressure on his handcuffs causing Garcia severe pain. *See id.* ¶ 54.

Upon his arrival at the medical department, a medical staff member evaluated Garcia's physical and mental health. *See id.* ¶ 55. After her evaluation, the staff member signaled to Lieutenant Earley that she had cleared Garcia for placement in the restrictive housing unit. *See id.*

Upon his arrival in the restrictive housing unit, officers subjected Garcia to a search of his clothes, body and body cavities. *See id.* ¶ 56. K-9 Handler Doe was able to observe the search and Garcia's naked body for approximately sixty seconds. *See id.*

After completing the strip search, officers placed Garcia in a "dry cell" which smelled of urine and feces. *See id.* at 10-11 ¶¶ 57–58. The toilet in the cell, which could only be flushed from the outside, was clogged up with "what appeared to be bio-hazardous waste" and some areas of the walls of the cell were covered with streaks of dried blood and excrement. *See id.* The cell was equipped with cameras that enabled staff to observe Garcia twenty-four hours a day. *See id.* at 10 ¶ 57. After being secured in the cell, Garcia voiced his health and sanitation concerns to Lieutenant Earley through the cell door, but Lieutenant Earley ignored Garcia's complaints. *See id.* at 11 ¶ 59.

Lieutenant Earley explained to Garcia that his placement on administrative detention was due to a mix-up or mis-communication regarding the way that the initial disciplinary report for

contraband was handled or processed and the type of sanctions that were imposed pursuant to Garcia's plea of guilty to the disciplinary report. *See id.* at 12 ¶¶ 65–66. Lieutenant Earley indicated that Warden Ford and Deputy Warden Rodriguez had ordered him to place Garcia on administrative detention and to "fix" the mix-up immediately. *See id.* ¶ 70. Lieutenant Earley and Investigator Gottlieb also mentioned that as of February 17, 2016, officials had become aware that Garcia had engaged in criminal activity and had referred the matter to the Connecticut State Police for investigation. *See id.* at 14 ¶ 83. Both Lieutenant Earley and Investigator Gottlieb stated that the matter was out of their hands. *See id.* at 13 ¶¶ 74–75.

Garcia requested that he be permitted to contact "his then attorney at law, James R. Hardy, II" in order to protect his civil rights. *See id.* at 14 ¶ 78. Lieutenant Earley denied the request and indicated that he did not think it was an appropriate time for Garcia to make a legal call. *See id.* ¶¶ 79–80.

Several hours after his placement in a cell in the restrictive housing unit, Captain Rios came by and observed that Garcia had placed a notice on the window of his cell door indicating that he was going to engage in a hunger strike until prison officials provided him with due process, equal protection and access to a legal assistance and reasonable living conditions. *See id.* at 16 ¶ 94. Captain Rios explained that only Commissioner Semple could "re-visit" the disposition of a disciplinary charge "with the intent to re-write mistakes and/or produce an outside charge." *See id.* at 17 ¶ 96. Although, Captain Rios was aware that neither Warden Ford, nor Deputy Warden Rodriguez had consulted with Commissioner Semple prior to re-opening the February 17, 2016 disciplinary matter against Garcia, she took no action to correct the situation. *See id.* at 17 ¶ 97.

After observing the conditions in Garcia's cell, Captain Rios transferred him to another clean cell in the restrictive housing unit. *See id.* ¶ 98. Garcia asked Captain Rios for permission to call his attorney, but she indicated that she would defer to the decision of Lieutenant Earley and denied the request. *See id.* ¶ 99. Prior to leaving the restrictive housing unit, Captain Rios encouraged Garcia to eat some food. *See id.*

A short time later, Lieutenants Scarchilli and Montefusco spoke to Garcia regarding his confinement in the restrictive housing unit. *See id.* at 17–18 ¶¶ 100–01. Lieutenant Scarchilli became "agitated" when he learned about the lack of communication among ranking officers and Lieutenant Montefusco expressed disappointment regarding "Top-Level Management's blatant abuse of policy." *See id.*

On February 26, 2016, Intelligence Coordinator Rodriguez directed Garcia to prepare himself for his interview with Connecticut State Police Trooper Stebbins, escorted him to an office and handed him a voluntary interview authorization form to sign. *See id.* at 18 ¶¶ 102–04. Garcia signed the authorization form under protest. *See id.* ¶ 104.

When Trooper Stebbins arrived at the office, he began to read the incident report prepared by prison officials in conjunction with the incident involving the discovery of contraband items in Garcia's cell on February 17, 2016. *See id.* ¶ 106. Trooper Stebbins indicated that Department of Correction officials had contacted him on February 17, 2016, but he could not explain why it had taken him until February 26, 2016 to come to investigate the incident and the contraband items that had been discovered in Garcia's cell. *See id.* at 20 ¶ 117.

Trooper Stebbins showed Garcia a copy of a photograph of "an item in question." *See id.* at 21 ¶ 122. Trooper Stebbins then pulled a "plastic instrumentality" from his coat pocket and

asked Garcia to identify it. *See id.* Garcia did not answer the question and "invoked his right against self-incrimination." *See id.* Trooper Stebbins stated that Warden Ford, Deputy Warden Rodriguez and Lieutenant Earley had requested that he charge Garcia with being in possession of "said instrument, an alleged 6 inch shank." *See id.* ¶ 123. Garcia immediately requested permission to call his attorney or Inmates' Legal Aid Services. Trooper Stebbins denied Garcia's request and continued to interview him. *See id.* ¶ 124.

Garcia confronted Trooper Stebbins regarding the fact that the shank had not been placed in a bag or a container and that Trooper Stebbins had not worn gloves while handling the shank. *See id.* at 21–22 ¶¶ 128, 131. In response, Trooper Stebbins asked Garcia to relate his version of the events surrounding the discovery of contraband items during a search of his cell. *See id.* at 22 ¶ 131. Garcia informed Trooper Stebbins that on February 18, 2016, prison officials at Enfield had disposed of the disciplinary report charging him with possession of contraband items, described as homemade needles and sharpened tools for engraving and modifying electronics that were found in his cell on February 17, 2016. *See id.* at 21 ¶ 125; Ex. 3 at 39–40. Trooper Stebbins indicated that he was unaware that a disciplinary report had already been issued and stated that he must speak to prison officials about the matter. *See id.* at 22 ¶¶ 132–33. When he returned to the interview room, Trooper Stebbins indicated that prison officials had denied any wrongdoing. *See id.* ¶ 134.

Garcia requested that Trooper Stebbins file a criminal complaint on his behalf against prison officials who had threatened him on February 25, 2016. *See id.* ¶ 135. Trooper Stebbins denied Garcia's request and attempted to persuade Garcia to submit a written statement admitting that he had possessed the shank that had been found in his cell on February 17, 2016.

*See id.* at 22–23 ¶¶ 135–36.  Garcia declined to submit a written statement incriminating himself.  Trooper Stebbins did not recommend that criminal charges be filed against Garcia or anyone else in connection with any of the items that were recovered from Garcia's cell on February 17, 2016.  *See id.* at 23 ¶ 138 & at 28 ¶ 169.

After the interview with Trooper Stebbins had ended, Lieutenant Earley attempted to convince Garcia to sign a document admitting that he had been aware of contraband being smuggled into Enfield.  *See id.* ¶¶ 140–41.  Lieutenant Earley indicated that if Garcia signed the document, he would either release Garcia from the restrictive housing unit or permit Garcia to make a telephone call to an attorney or the Inmates' Legal Aid Services office.  *See id.* ¶ 142.  Garcia denied any knowledge of contraband being brought into Enfield and did not sign the document.  *See id.* ¶ 141.  During his meeting with Lieutenant Earley, Garcia stated that he needed to see a psychologist, but Lieutenant Earley ignored his request.  *See id.* at 24 ¶ 143.

On February 27, 2016, Lieutenant Lee spoke to Garcia.  *See id.* ¶ 147.  She stated that she thought "there was a clear abuse of the policy, but that he should wait it out because they're probably making you sweat."  *See id.*  On February 28, 2016, Lieutenant Kit spoke to Garcia and indicated that his detention in the restrictive housing unit was "un-called for" and was a form of retaliation.  *See id.* at 25 ¶ 148.

On March 2, 2016, Counselor Timbro indicated that he would attempt to convince prison officials to permit Garcia to make a legal telephone call.  *See id.* ¶ 149.  Garcia did not hear from Counselor Timbro again.  *See id.*

Later that day, Counselor Supervisor Bowman visited Garcia and vowed to look into his request for a legal telephone call.  *See id.* ¶ 150.  Garcia did not hear from Counselor Supervisor

Bowman again.  *See id.*

During the morning of March 3, 2016, Deputy Warden Rodriguez spoke to Garcia and informed him that it was permissible to reinstate disciplinary charges without the written approval of the Commissioner of Ccorrection.  *See id.* ¶ 151.  Garcia learned that Deputy Warden Rodriguez believed Trooper Stebbins should have charged him with possession of a dangerous weapon and that Deputy Warden Rodriguez had recommended that Garcia be placed on administrative segregation status at Northern Correctional Institution.  *See id.* at 25–26 ¶¶ 152–53.  Other prison officials disagreed with that recommendation.  *See id.* at 25 ¶ 152.  When Garcia accused Deputy Warden Rodriguez and other prison officials of engaging in reckless and retaliatory behavior by holding him accountable for mistakes that were made by employees of the Department of Correction regarding the handling of the disciplinary report charging him with contraband, Deputy Warden Rodriguez stated that Garcia would be moved from Enfield "one way or another."  *See id.* at 26 ¶¶ 154–55.

At approximately 1:10 p.m., Garcia advised Lieutenant Earley that he had spoken to Deputy Warden Rodriguez and would be filing a law suit over deprivations that had occurred. *See id.* at 26–27 ¶¶ 158–59.  A short time later, Garcia spoke to Lieutenant Earley and Captain Hunter and indicated that he intended "to hold them accountable for the series of breaks in command" in connection with actions taken in response to the discovery of items of contraband in his cell.  *See id.* at 27 ¶¶ 160–62.

On March 3, 2016, Director Offender Classification and Population Management Maiga approved the request by Warden Ford and District Administrator Quiros to raise Garcia's overall security level to a level 4, designated Garcia as a high security inmate and directed Warden Ford

to hold a hearing regarding the placement of Garcia on high security status.  *See id.* at 28 ¶ 166 & Exs. 8, 9 at 47–48.  Warden Ford did not hold a hearing.  *See id.* at 28 ¶ 166.

On March 4, 2016, Lieutenant Earley and Property Officer Valierre informed Garcia that he would be transferred from Enfield to another prison facility pursuant to an order from Deputy Warden Rodriguez.  *See id.* at 27 ¶ 164.  Property Officer Valierre stated that Deputy Warden Rodriguez had ordered him to confiscate Garcia's Nintendo 3DS XL game console and fourteen games as contraband.  *See id.* at 27–28 ¶ 165.  At approximately 4:00 p.m., prison officials transported Garcia to MacDougall-Walker, a high security facility.  *See id.* at 28 ¶ 166 & Ex. 7 at 46.  Garcia claims that prison officials at MacDougall-Walker confined him in a restrictive housing unit.  *See id.* ¶ 167.

Approximately ten days after his transfer to MacDougall-Walker, Garcia filed multiple grievances regarding the incidents that had occurred at Enfield in February and early March 2016.  *See id.* at 29 ¶ 170 & Exs. 11–18 at 50–65.  Garcia received receipts from Grievance Coordinator Bennett for two of the four grievances that he filed in March 2016.  *See id.* & Ex. 19 at 66.  On May 4, and May 31, 2016, Garcia filed grievance appeals regarding the incidents that had occurred at Enfield in February and early March 2016.  *See id.* & Exs. 20–21 at 67–68.  He never received responses to his grievances or grievance appeals.  *See id.*

On February 14, 2017, at MacDougall-Walker, Garcia spoke to Commissioner Semple about what had transpired at Enfield in February and March 2016, after a search of his cell had revealed items meeting the definition of contraband.  *See id.* at ¶ 172.  Commissioner Semple requested that Garcia notify him regarding the individuals who were responsible for the incidents in question.  *See id.* ¶ 173.  Garcia wrote a letter to Commissioner Semple on February 15, 2017

and placed the letter in the mail on February 16, 2017.  *See id.*  Garcia is doubtful that the letter reached Commissioner Semple.  *See id.*

III.    **Discussion**

Garcia contends that the defendants violated his rights under the First, Fourth, Fifth, Eighth and Fourteenth Amendments.  In addition, he asserts a state law claim of intentional infliction of emotional distress.  He seeks declaratory and injunctive relief and monetary damages.

A.      **Connecticut State Trooper Stebbins**

Garcia alleges that Trooper Stebbins came to interview and question him on February 26, 2016.  Garcia contends that Trooper Stebbins attempted to persuade him to admit to having possessed the 6-inch shank that was allegedly found in his cell during a search on February 17, 2016.  Garcia claims that he invoked his right against self-incrimination and did not admit to or make a statement regarding possession of the shank that had allegedly been found in his cell.  Garcia alleges that at another point during the interview, he demanded that Trooper Stebbins permit him to call his attorney or the Inmates' Legal Aid Services, but Stebbins denied the request and continued to interview him.

The Fifth Amendment to the United States Constitution provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  It is applicable to state criminal proceedings by virtue of the Fourteenth Amendment.  *See Malloy v. Hogan*, 378 U.S. 1, 6 (1964).  To the extent that Garcia is claiming that Trooper Stebbins infringed on his right to counsel by not honoring the invocation of his right to an

attorney under *Miranda v. Arizona,* 384 U.S. 436 (1966),[1] the right to counsel during a custodial interrogation recognized in *Miranda* is merely a procedural safeguard whether it arises under the Fifth or Sixth Amendment and a violation of *Miranda* rights does not give rise to a civil rights claim under 42 U.S.C. § 1983. *See Myers v. Cty. of Nassau*, 825 F. Supp. 2d 359, 367 (E.D.N.Y. 2011) ("The remedy for a violation of this right [to counsel under the Fifth Amendment] is exclusion of any self-incriminating statements from use at a criminal proceeding, and not an action for damages under Section 1983.") (citing *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003); *Neighbour v. Covert*, 68 F.3d 1508, 1510 (2d Cir. 1995); *Paige v. City of New York*, 2011 WL 3701923, *3 (E.D.N.Y. 2011); *McZorn v. Endicott Police Dept.*, 2008 WL 163581, *9 (N.D.N.Y. 2008)). Furthermore, Garcia concedes that Trooper Stebbins did not recommend that criminal charges be brought against him. Nor does Garcia allege that the State of Connecticut ever filed criminal charges against him in connection with the items found in his cell on February 17, 2016. Accordingly, any claim that Trooper Stebbins violated Garcia's Fifth Amendment right to counsel during the interview is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

Garcia also contends that he asked Trooper Stebbins to "lodge a formal criminal complaint" against several defendants who had threatened him on February 25, 2016, but Trooper Stebbins decided not to recommend that such charges be filed by the State of

---

[1] In *Miranda*, the Supreme Court concluded that interrogation of individuals suspected of committing a crime in certain custodial situations was inherently coercive. 384 U.S. at 457–58, 467, 469–70. The Court held that statements made by an individual in those situations are not admissible unless, prior to making the statements, law enforcement officials adequately and effectively informed the individual of his right to remain silent and his right to an attorney and the individual freely decided to waive those rights. *Id.* at 478–79. The Court stated that prior to questioning an individual during a custodial interrogation, law enforcement officers must inform the individual that he or she "has a right to remain silent, that anything he [or she] says can be used against him [or her] in in a court of law, that he [or she] has the right to" have counsel present during questioning, and that an attorney will be appointed to represent him prior to questioning if he or she is "unable to afford an attorney." *Id.* at 479. *Miranda* warnings therefore are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker*, 417 U.S. 433, 444 (1974).

Connecticut. Garcia has no constitutionally protected right to a proper investigation. *See Lewis v. Gallivan*, 315 F. Supp. 2d 313, 316–17 (W.D.N.Y. 2004) ("There is . . . no constitutional right to an investigation by government officials.") (internal quotation marks and citations omitted); *Santossio v. City of Bridgeport*, 2004 WL 2381559, at *4 (D. Conn. Sept. 28, 2004) ("the United States Constitution does not grant plaintiffs a right to an adequate investigation or adequate after-the-fact punishment") (citing cases). Furthermore, a victim of allegedly criminal conduct is not entitled to a criminal investigation or the prosecution of the alleged perpetrator of the crime. *See Leeke v. Timmerman*, 454 U.S. 83, (1981) (inmates alleging beating by prison guards lack standing to challenge prison officials' request to magistrate not to issue arrest warrants); *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); *McCrary v. Cty. of Nassau*, 493 F. Supp. 2d 581, 588 (E.D.N.Y. 2007) ("A private citizen does not have a constitutional right to compel government officials to arrest or prosecute another person.").

Thus, the fact that Trooper Stebbins chose not to pursue criminal charges against any of the defendants for their alleged threatening conduct towards Garcia does not constitute a constitutional violation. Because Garcia has no right to have any of the defendants prosecuted for allegedly threatening him, the allegation that Trooper Stebbins refused to pursue criminal charges against any of the defendants for their alleged threatening conduct towards Garcia fails to state a claim upon which relief may be granted and is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### B.      Commissioner Semple

Garcia describes Commissioner Semple as being responsible for the overall operation of the State of Connecticut Department of Correction, including MacDougall-Walker.  *See* Compl. at 2 ¶ 4.  Garcia does not refer to Commissioner Semple as having been involved in the events that occurred at Enfield in February and early March 2016 or indicate that he made any attempt to contact Commissioner Semple at the time of the events.  Furthermore, Garcia's allegations regarding the conduct of the defendants, other than Commissioner Semple, suggest that those defendants did not contact or inform Commissioner Semple regarding the decision to place him on administrative detention on February 25, 2016, or the decision to raise his security level and to place him on high security status on March 3, 2016, or the decision to transfer him to MacDougall-Walker in early March 2016.

It was not until almost a year later on February 14, 2017, at MacDougall-Walker, that Garcia allegedly spoke to Commissioner Semple regarding the incidents that had occurred at Enfield in February and March 2016.  *See* Compl. ¶ 172.  During that conversation, Commissioner Semple suggested that Garcia send him a list of the prison officials who were responsible for or had been involved in the incidents that had occurred at Enfield.  *See id.*  Garcia states that he sent a letter to Commissioner Semple on February 16, 2017, but he does not think it reached the Commissioner.  *See id.* ¶ 173.

These allegations do not state a claim that Commissioner Semple was aware of or involved in the incidents that occurred at Enfield in February 2016.  Garcia conceded that for a period of time after he sent the letter in February 2017, he did not pursue the matter with the Commissioner because he feared that he might be "subjected to unimaginable treatment at such a

high risk facility filled with lifers." *Id.* Garcia does not indicate that he ever took steps to confirm whether Commissioner Semple received his February 2017 letter or that he ever attempted to pursue the matter further with the Commissioner.

The facts, as alleged, do not state a claim that Commissioner Semple violated Garcia's federally or constitutionally protected rights with regard to the incidents that occurred in February 2016 at Enfield. The claims against Commissioner Semple are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### C. Fourth Amendment Claim

Garcia alleges that pursuant to Lieutenant Earley's February 25, 2016 order that he be placed in administrative detention pending an investigation, Lieutenant Earley and other officers escorted him to a room in the restrictive housing unit and Lieutenant Earley oversaw the officers who strip searched him. Garcia states that officers searched his clothes, body and body cavities in the presence of K-9 Handler Jane Doe. He describes the search as intrusive, embarrassing and humiliating.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Second Circuit has recently "reiterate[d] that inmates retain a limited right of bodily privacy under the Fourth Amendment." *Harris v. Miller*, 818 F.3d 49, 62 (2d Cir. 2016). When evaluating a claim that an isolated search infringed on an inmate's right of bodily privacy, a court must consider four factors in determining whether the search was reasonable: "(1) the scope of the intrusion; (2) the manner in which it was conducted; (3) the justification for initiating it; and (4) the place in which it was conducted." *Harris*, 818 F.3d at 63 (citing *Bell v.*

*Wolfish*, 441 U.S. 520, 559 (1979)).  A strip search is unconstitutional under the Fourth Amendment "if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish."  *Jean–Laurent v. Wilkerson,* 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006) (citations omitted).

I construe Garcia's allegations as challenging the scope of the strip search and the manner in which the search was conducted, including the fact that a female officer was present during the search.  I conclude that Garcia has stated a plausible Fourth Amendment claim with regard to the strip search conducted pursuant to the order of Lieutenant Earley.  Garcia, however, has not presented specific allegations detailing how the conduct of K-9 Handler Jane Doe violated his Fourth Amendment rights.  The Fourth Amendment claim against K-9 Handler Jane Doe is dismissed for failure to state a claim upon which relief may be granted.  *See* 28 U.S.C. § 1915A(b)(1). The Fourth Amendment claim against Lieutenant Earle will proceed.

### D.       Fifth Amendment Claim

In his description of legal claims, Garcia contends that the defendants subjected him to "being twice put in jeopardy for the same offense."  Compl. ¶ 181.  The Double Jeopardy Clause of the Fifth Amendment, made applicable to the States by the Fourteenth Amendment, prohibits both multiple punishments for the same offense and multiple prosecutions for the same offense. *See* U.S. Const. amend V ("[n]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb . . . . "); *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) ("Fifth Amendment guarantee against double jeopardy . . . . consist[s] of three separate constitutional protections.  It protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects

against multiple punishments for the same offense.").

It is well-established that the Double Jeopardy Clause of the Fifth Amendment is limited to criminal proceedings. *See Hudson v. United States*, 522 U.S. 93, 99 (1997) ("The [Double Jeopardy Clause] protects only against the imposition of multiple *criminal* punishments for the same offense . . . and then only when such occurs in successive proceedings") (citations omitted). Prison disciplinary hearings and classification decisions or hearings are civil in nature. *See Wolff v. McDonnell*, 418 U.S 539, 556 (1974) ("Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply."); *Porter v. Coughlin,* 421 F.3d 141, 144, 148–49 (2d Cir. 2005) (finding no violation of the Double Jeopardy Clause because disciplinary sanction of three years in a restrictive housing unit was "clearly related to a nonpunitive interest" and was intended as a civil remedy and the disciplinary proceeding pursuant to which the sanction was imposed "was civil in nature"); *United States v. Hernandez-Fundora*, 58 F.3d 802, 806–07 (2d Cir. 1995) (holding that even though sanction of forty-five days of disciplinary segregation might have had a "punitive component," the sanction "was sufficiently related to the government's remedial interest that it did not constitute punishment for double jeopardy purposes") (internal quotation marks and citation omitted); *Knight v. Semple*, 2018 WL 4623030, at *3 (D. Conn. Sept. 26, 2018) ("Because prisoner classification is not 'essentially criminal,' the decision to raise [Knight's] sexual treatment needs score and the policy under which this was done do not support a double jeopardy claim.") (citations omitted).

Garcia does not allege that he was charged with or convicted of a criminal offense related to the contraband items found in his cell on February 17, 2016. Furthermore, there are no facts

to suggest that the sanctions imposed upon Garcia pursuant to the issuance of the disciplinary report for contraband or Garcia's subsequent confinement in the restrictive housing unit on administrative detention status or Garcia's classification as a high security inmate constituted punishment or involved criminal proceedings. Accordingly, the Double Jeopardy Clause of the Fifth Amendment is not applicable to Garcia's claims regarding his placement on administrative detention and changes to his overall security level and classification. The Fifth Amendment double jeopardy claim is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

The Fifth Amendment also provides: "nor shall any person be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Because the Due Process Clause of the Fifth Amendment applies to the federal government and not to the state, any due process claims asserted by Garcia under the Fifth Amendment against the defendants, who are all State of Connecticut employees, are not cognizable. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"); *Poe v. Ullman*, 367 U.S. 497, 540 (1961) (prohibitions "against the deprivation of life, liberty or property without due process of law" set forth in Fourteenth Amendment is applicable to state government and the same prohibitions in Fifth Amendment are applicable to "the Federal Government"); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466–67 (S.D.N.Y. 2009) (holding that any due process claim against the city was properly brought under the Fourteenth Amendment, not the Fifth Amendment). The Fifth Amendment due process claims are dismissed. *See* 28 U.S.C. § 1915A(b)(1). I address the Fourteenth Amendment due process claims in a subsequent section of this ruling.

### E.  Eighth Amendment Claims

Garcia includes allegations that some defendants threatened to use force against him, subjected him to unsafe conditions of confinement and deprived him of access to mental health treatment.   Garcia generally contends that their conduct constituted cruel and unusual punishment in violation of the Eighth Amendment.

Although the Constitution does not require "comfortable" prison conditions, the Eighth Amendment imposes certain duties on prison officials, to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (internal quotation marks and citations omitted).  To state a deliberate indifference to health or safety claim under the Eighth Amendment, an inmate must demonstrate both an objective and a subjective element.

To meet the objective element, an inmate must allege that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[] necessit[y]" or a "substantial risk of serious harm." *Id.* at 834 (internal quotation marks and citations omitted).  To meet the subjective element, an inmate must allege that the defendant prison officials possessed culpable intent, that is, the officials knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See id.* at 834, 837.  Thus, an allegation of "mere negligen[t]" conduct is insufficient. *Id.* at 835.  Rather, the subjective element requires that a plaintiff allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006).

Deliberate indifference by prison officials to a prisoner's serious medical or mental health

needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) ("The Eighth Amendment forbids 'deliberate indifference to serious medical needs of prisoners,' . . . which includes needs for mental health care.") (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and citing *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989)). To state a claim for deliberate indifference to a serious medical or mental health need, a plaintiff must meet a two-pronged test.

Under the first prong, a plaintiff must demonstrate that his or her medical or mental health need was "'sufficiently serious.'" *Spavone*, 719 F.3d at 138 (2d Cir. 2013) (quoting *Salahuddin*, 467 F.3d at 279 (quoting *Farmer*, 511 U.S. at 834). Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quotation marks omitted). If an inmate alleges delay or interruption in treatment rather than failure to receive any treatment at all, "the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003). "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for [these] purposes." *Id.* (citing *Chance*, 143 F.3d at 702–03). Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions. *See Salahuddin*, 467 F.3d at 279–80.

In *Hudson v. McMillian*, 503 U.S. 1 (1992), the Supreme Court established the minimum

standard to be applied in determining whether force by a correctional officer against a sentenced inmate states a constitutional claim under the Eighth Amendment in contexts other than prison disturbances. When an inmate claims that excessive force has been used against him by a prison official, he has the burden of establishing both an objective and subjective component to his claim. *See Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

To meet the objective component, the inmate must allege that the defendant's conduct was serious enough to have violated "contemporary standards of decency." *Hudson*, 503 U.S. at 8 (internal quotation marks and citation omitted). The subjective component requires the inmate to show that the prison officials acted wantonly and focuses on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). The court considers factors including "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7 (internal quotations and citation omitted).

### 1. Excessive Force

Garcia alleges that on February 25, 2016, when he did not immediately comply with Lieutenant Earley's order to place his hands behind his back, Lieutenant Earley withdrew his can of a chemical agent from his pocket and "took a threatening stance." Compl. at 9 ¶ 50. Garcia alleges that K-9 Handler Jane Doe and her canine were present during his placement in handcuffs and that she was "handling her canine in an uncontrollable manner." *See id.* ¶ 48. Garcia alleges that during his escort from the administrative building to the medical unit, officers

exerted pressure on his handcuffs which caused them to tighten up and cause him incredible pain. *See id.* at 10 ¶ 54.

Garcia does not allege that Lieutenant Earley pointed the chemical agent cannister at him or deployed the chemical agent at him or in his presence. It is evident that in response to Garcia's failure to comply with his order, Lieutenant Earley pulled out his cannister of a chemical agent in case it became necessary to use it. That threat of force does not meet the objective component of the Eighth Amendment standard. *See Lizardo v. Denny's, Inc.*, 2000 WL 976808, at *12 (N.D.N.Y. July 13, 2000) ("Plaintiffs' claims that rest on the threatened use of mace are also dismissed for failing to state a constitutional injury."), *aff'd*, 270 F.3d 94 (2d Cir. 2001). The Eighth Amendment excessive force claim against Lieutenant Earley is dismissed for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1).

With regard to K-9 Handler Jane Doe, Garcia suggests that she did not handle her canine in a controlled manner during his placement in handcuffs. Garcia does not allege, however, that K-9 Handler Jane Doe permitted or directed her canine to touch or harm him in any way. Thus, Garcia has not asserted that he suffered a serious deprivation to his health or safety. The allegations against K-9 Handler Jane Doe do not meet the objective component of the Eighth Amendment standard and the excessive force claim against K-9 Handler Jane Doe is dismissed for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1).

Garcia does not identify the officers who allegedly held his arms during the escort to the medical department from the administrative building. Thus, it is unclear whether any defendant was involved in applying pressure to the handcuffs during the escort. Furthermore, Garcia has not alleged that the handcuffing led to a serious deprivation. Garcia claims that the tight

handcuffs caused him "incredible" pain but does not allege that he complained to anyone or sought treatment for the pain or that he suffered any permanent damage to his wrists.

I conclude that absent allegations of permanent injury to Garcia's wrists, Garcia has asserted insufficient facts to meet the objective prong of the Eighth Amendment standard with regard to the conduct of any defendant who might have been involved in the escort of Garcia from the administrative building to the medical department. *See Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 270 (N.D.N.Y. 2018) (acknowledging that "to sufficiently plead an excessive force claim based upon tight handcuffing, [an inmate] must allege more than a temporary injury" and dismissing Eighth Amendment excessive force claim because allegation that "handcuffs caused [an inmate's] wrists to be cut" did not constitute "a permanent injury.") (internal quotation marks omitted). The claim that during the escort of Garcia to the medical department on February 25, 2016, officers applied excessive pressure to Garcia's handcuffs which resulted in pain to his wrists, is dismissed for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1).

### 2. Deliberate Indifference to Mental Health Needs

Garcia claims that prior to February 2016, he had a history of post-traumatic stress disorder and anxiety. He alleges that at the time of his initial placement in the restrictive housing unit on February 25, 2016, he repeatedly asked Lieutenant Earley to arrange for him to be seen by a psychologist. Garcia contends that Lieutenant Earley ignored his requests for mental health treatment.

Although, on February 25, 2016, Garcia may have been previously diagnosed as suffering from post-traumatic stress disorder and anxiety, he does not allege that those conditions

became worse or that they affected his daily activities during his nine-day confinement in the unit. Nor does he allege that he requested mental health treatment at any other time during that period of time. I conclude that Garcia has not alleged that he suffered from a serious risk of harm to his health with regard to the interruption or delay in mental health treatment during his confinement in the restrictive housing unit. *See Smith*, 316 F.3d at 186 (in a situation where the complaint is a delay or interruption in treatment rather than a failure to receive any treatment at all, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant" in determining whether the inmate suffered from a serious medical need). Accordingly, Garcia has not asserted sufficient facts to meet the objective prong of the Eighth Amendment standard and the claim that Lieutenant Earley was deliberately indifferent to Garcia's mental health needs is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 3.    Conditions of Confinement

Garcia states that on February 25, 2016, Lieutenant Earley placed him in an odorous and unsanitary cell in the restrictive housing unit. The cell's toilet was clogged and there appeared to be dried blood and excrement on the walls. Upon his placement in the cell, Garcia immediately made Lieutenant Earley aware of the conditions, but Lieutenant Earley ignored his complaints. Several hours later, Captain Rios became aware of the conditions and moved Garcia to a sanitary cell within the restrictive housing unit.

Garcia does not allege that he suffered any injuries to his health from his short-term exposure to the conditions in the first restrictive housing unit cell. He concedes that once Captain Rios became aware of his concerns about the conditions in the cell, she moved him to

24

another cell in the restrictive housing unit that was clean and sanitary. Thus, I conclude that Garcia has not alleged he suffered a serious deprivation to his health from the short-term exposure to unsanitary conditions in the restrictive housing unit. Thus, his claim that Lieutenant Earley subjected him to conditions of confinement that violated the Eighth Amendment is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### F.    Fourteenth Amendment Claim

Garcia's allegations may be construed as asserting four Fourteenth Amendment claims. Garcia alleges that: (1) the defendants violated Garcia's due process rights when they failed to hold a hearing or other proceeding either before or after they confined him in administrative detention for nine days or before or after they classified him as a high security inmate; (2) Property Officer Valierre violated Garcia's due process rights when he failed to hold a hearing or other proceeding either before or after confiscating his Nintendo 3DS XL game console and games; (3) Deputy Warden Rodriguez violated Garcia's due process rights when he failed to hold a hearing or other proceeding prior to transferring Garcia to MacDougall-Walker; and (4) Administrative Remedies Coordinators Bennett and Ortiz violated Garcia's due process rights by failing to properly process or address Garcia's grievances and grievance appeals.

### 1.    Procedural Due Process – Administrative Detention, Risk Level Increase, Change in Classification, Transfer to a New Facility

Garcia alleges that on February 25, 2016, Lieutenant Earley placed him in administrative detention pending an investigation, on March 3, 2016, Director Maiga raised his overall classification level to a level 4, approved his placement on high security status, and directed Warden Ford to hold a hearing regarding that placement and on March 4, 2016, Deputy Warden Rodriguez transferred him to MacDougall-Walker. Garcia contends that he did not receive a

hearing or other process prior to or after the change in his place of confinement, or his placement on high security status or his transfer to a more restrictive prison facility.

The Fourteenth Amendment's Due Process Clause "protects persons against deprivations of life, liberty, or property."  U.S Const. amend. XIV.  "Liberty interests protected by the Fourteenth Amendment may arise from two sources – the Due Process Clause itself and the laws of the States."  *Hewitt v. Helms*, 459 U.S. 460, 466 (1983).  The standard analysis for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient."  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court recognized that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause."  *Id.* at 483–84.  A plaintiff has a protected liberty interest only if the state created such an interest in a statute or regulation and the deprivation of that interest caused him to suffer an atypical and significant hardship.  *See Tellier v. Fields,* 280 F.3d 69, 80-81 (2d Cir. 2000).

In *Arce v. Walker*, 139 F.3d 329, 334–35 (2d Cir. 1998), the Second Circuit concluded that the *Sandin* analysis should be applied to determine whether placement in non-punitive administrative segregation implicates a liberty interest.  In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court considered a due process claim asserted by inmates who had been classified for placement in a high security state prison for safety and security, rather than disciplinary reasons.  In determining whether the inmates had a liberty interest in avoiding confinement in the very restrictive, maximum security prison for an indefinite period of time, the

Court applied the standard set forth in *Sandin*. *See id.* at 223 ("After *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'") (quoting *Sandin*, 515 at 484). The Court concluded that the restrictive conditions at Ohio State Penitentiary "taken together [] impose[d] an atypical and significant hardship" on inmates and gave "rise to a liberty interest in their avoidance." *Id.* at 224.

The Second Circuit has held that "in determining whether [an inmate] endured an atypical and significant hardship" a district court should consider the duration of the inmate's confinement in segregation and "the extent to which the conditions [in] . . . segregation differ from other routine . . . conditions" in general population. *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (internal quotation marks and citation omitted). With regard to duration, the Second Circuit has resisted establishing a "bright line rule that a certain period of . . . confinement [in a restrictive housing unit] automatically fails to implicate due process rights." *Id.*

### a. Administrative Detention

At approximately 1:45 p.m. on February 25, 2016, Lieutenant Earley ordered Garcia's placement on administrative detention status. *See* Compl. at 8 ¶ 44 & Ex. 5 at 43–44. Garcia concedes that he received notice of the order regarding his placement on administrative detention. *See* Compl. at 24 ¶ 144 & Ex. 5 at 43–44. The order provided that Garcia had been placed on administrative detention pending an investigation and because his continued presence in general population posed a serious threat to himself, prison staff and other inmates or the

security of the facility.  *See* Compl. at Ex. 5 at 43.  He remained on administrative detention until prison officials transferred him to MacDougall-Walker at approximately 4:00 p.m. on March 4, 2016.  *See* Compl. at Exs. 6–7 at 45–46.

Garcia was confined in a cell in the restrictive housing unit on administrative detention status for nine days.  Aside from the unsanitary conditions of the initial cell in which Garcia was placed for several hours, there are no allegations suggesting that the conditions under which Garcia was confined for the remainder of his time in the restrictive housing unit at Enfield subjected him to an atypical and significant hardship.  Accordingly, Garcia has not alleged that he experienced conditions that were sufficiently atypical or significant compared to the basic conditions of prison life to give rise to a liberty interest in their avoidance.  Absent a liberty interest, Garcia is not entitled to procedural due process protections.  I conclude that the facts as alleged in the complaint, do not state a claim that the defendants violated Garcia's procedural due process rights in connection with his placement on administrative detention at Enfield for nine days.  The due process claim related to Garcia's confinement on administrative detention status is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

### b.    High Security Status

Garcia states that he did not receive a hearing regarding his placement on high security status.  He indicates that pursuant to that classification, prison officials transferred him to MacDougall-Walker and placed him in a cell in Q-Unit.  Garcia states that he endured restrictive conditions of confinement in that unit.  The complaint includes a description of the restrictive conditions.  From exhibits attached to the complaint, it is apparent that Garcia remained confined in Q-Unit until at least May 31, 2016.  *See* Compl. Ex. 21 at 68.  Given the duration of his

confinement in the restrictive housing unit at MacDougall-Walker, at least 89 days, and the restrictive nature of the conditions to which Garcia was subjected during his confinement, in that unit, I conclude that Garcia has stated a plausible procedural due process claim with regard to his placement on high security status.

### c.      Risk Level Increase

Garcia challenges the increase in his overall classification level to a level 4. He claims that he did not receive any hearing or other proceeding in connection with that increase in level.

To assert a due process claim in connection with a classification decision, Garcia must show that he had a protected liberty interest in remaining free from the classification and, if he had such an interest, that the defendants deprived him of the interest without affording him due process of law. *See Walker v. Fischer*, 523 F. App'x 43, 44 (2d Cir. 2013) (summary order) (citing *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001)).

In *Sandin v. Conner*, the Supreme Court explained that for prisoners, a liberty interest warranting due process protection "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484 (internal citations omitted).

Whether restraint constitutes an "atypical and significant hardship" depends on the totality of the circumstances, particularly the severity and the duration of the deprivation. *See, e.g., Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999). Hardship is atypical and significant in relation to the ordinary incidents of prison life based on a comparison of the frequency and

duration of similar conditions of confinement. *See, e.g., Colon v. Howard*, 215 F.3d 227, 230–32

(2d Cir. 2000). Atypicality should be measured against the conditions afforded to the general

population within a given prison system, as well as those in routine administrative confinement.

*See Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999). Whether conditions constitute an

"atypical and significant hardship . . . in relation to the ordinary incidents of prison life" is a

matter of law. *Colon*, 215 F. 3d at 230.

Here, Garcia has not alleged any facts demonstrating how is level 4 classification caused

him to suffer "atypical and significant hardship." Thus, the allegation that the increase in

Garcia's overall risk level violated the Due Process Clause of the Fourteenth Amendment fails to

state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A(b)(1).

### d. Transfer to MacDougall-Walker

Garcia alleges that Deputy Warden Rodriguez improperly transferred him to

MacDougall-Walker, which is a more restrictive facility than Enfield. It is well-established that

an inmate has no right to be housed in a particular prison facility. *See Meachum v. Fano,* 427

U.S. 215, 225 (1976) (no liberty interest arising from Due Process Clause itself in transfer from

low-to maximum-security prison because "[c]onfinement in any of the State's institutions is

within the normal limits or range of custody which the conviction has authorized the State to

impose"); *Olim v. Wakinekona,* 461 U.S. 238, 248 (1983) (inmates have no right to be confined

in a particular prison within a given state); *Andrews v. Semple*, 2017 WL 5606740, at *4 (D.

Conn. Nov. 21, 2017) (dismissing due process claim that prison officials refused to transfer

inmate to prison facility of his choice, Garner Correctional Institution, because "he has no

constitutionally protected right to be housed" at Garner or any other facility); *Jarecke v. Hensley*,

552 F. Supp. 2d 261, 265 (D. Conn. 2008) ("Inmates have no constitutionally protected right to be confined in any particular correctional facility or housing unit."). Because Garcia has no liberty interest in his transfer to a particular prison facility, his claim that Deputy Warden Rodriguez violated his right to due process when he issued the order that he be transferred to MacDougall-Walker on March 4, 2016 fails to state a claim upon which relief may be granted. *See Meachum*, 427 U.S. at 225 ("That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules."). The Fourteenth Amendment claim related to Garcia's transfer to MacDougall-Walker is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 2. Property Claim

Garcia alleges that on March 4, 2016, just before his transfer to MacDougall-Walker, Property Officer Valierre confiscated his Nintendo 3DS XL game console and fourteen games. A claim for confiscation or loss of property is not cognizable in a Section 1983 action. The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment is not violated when a prison inmate loses personal belongings due to the negligent or intentional actions of correctional officers if the state provides an adequate post-deprivation compensatory remedy. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 543 (1981).

The State of Connecticut provides an adequate remedy for the kind of deprivation that the plaintiff alleges in Department of Correction Administrative Directives and under Connecticut statutes. Administrative Directive 9.6(16) & (F) provides that the Department of Correction's

"Lost Property Board shall hear and determine any claim by an inmate in a correctional facility who seeks compensation not exceeding . . . ($3,500.00) for lost or damaged personal property" and that an inmate may pursue his property claim with the Connecticut Claims Commissioner if the Board denies the claim completely or in part . Claims for payment or refund of money by the state may be presented to the Connecticut Claims Commission.  Conn. Gen. Stat. § 4-141 *et seq*. These state remedies are not inadequate simply because an inmate anticipates a more favorable remedy under the federal system or because it may take a longer time under the state system before his case is resolved.  *See Hudson*, 468 U.S. at 535.

Garcia does not indicate that he has pursued his available remedies through the Department of Correction's Lost Property Board or the Office of the Claims Commissioner. Thus, he has not alleged that the State of Connecticut's procedures for processing property claims are inadequate.  *See Riddick v. Semple*, 731 F. App'x 11, 13 (2d Cir. 2018) (affirming dismissal of inmate's deprivation of property claim on the ground that the inmate had not alleged that process provided by the State of Connecticut, including the opportunity to seek relief through the Office of the Claims Commissioner, was inadequate); *Edwards v. Erfe*, 588 F. App'x 79, 80–81 (2d Cir. 2015) (same).

The allegation that Officer Valierre improperly confiscated Garcia's Nintendo 3DS XL game console and games does not state a violation of Garcia's due process rights.  The Fourteenth Amendment due process claim against Officer Valierre is dismissed for failure to state a claim upon which relief may be granted.  *See* 28 U.S.C. § 1915A(b)(1).

### 3. Grievance Procedures

Garcia alleges that he filed multiple grievances and grievance appeals at MacDougall-

Walker regarding the incidents that had occurred at Enfield in February and March 2016. Garcia claims that Administrative Remedies Coordinators Bennett and Ortiz failed to respond to or properly process his grievances or grievance appeals.

The Second Circuit has held that neither state directives nor "state statutes . . . create federally protected due process entitlements to specific state-mandated procedures." *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003). Thus, allegations that a prison official violated the procedures set forth in a state's administrative remedy program that is applicable to prisoner grievances do not state a claim of a violation of an inmate's constitutional rights. *See Swift v. Tweddell,* 582 F. Supp. 2d 437, 445–46 (W.D.N.Y. 2008) ("It is well established [] that inmate grievances procedures are undertaken voluntarily by the states, that they are not constitutionally required, and accordingly that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim.") (collecting cases); *Fernandez v. Armstrong*, 2005 WL 733664, at *9 (D. Conn. Mar. 30, 2005) ("This district has previously held that failure of a correctional official to comply with the institutional grievance procedures [set forth in Administrative Directive 9.6] is not cognizable in an action filed pursuant to 42 U.S.C. § 1983, unless the action caused the denial of a constitutionally or federally protected right."). In addition, "prisoners do not have a due process right to a thorough investigation of grievances." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010) (citing *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 341–42 (S.D.N.Y. 2003) ("The corrections officers' failure to properly address [plaintiff's] grievances by conducting a thorough investigation to his satisfaction does not create a cause of action for denial of due process because [plaintiff] was not deprived of a protected liberty interest.")).

To the extent that Garcia claims that Remedies Coordinators Bennett and Ortiz did not respond to or ensure that other correctional staff responded to his grievances and appeals in a timely manner in accordance with Department of Correction Administrative Directive 9.6, such a claim does not rise to the level of a violation under the Fourteenth Amendment. *See Brown v. Graham*, 470 F. App'x 11, 13 (2d Cir. 2012) ("Brown's argument that he has a federally-protected liberty interest in the state's compliance with its own prison grievance procedures is meritless."). The Fourteenth Amendment due process claim against Bennett and Ortiz is dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### G. First Amendment Claims

Garcia alleges that on several occasions during late February and early March 2016, he asked to make a telephone call to his attorney or a legal services organization, but certain defendants denied his requests. I construe those allegations as a First Amendment claim of denial of access to the courts. Garcia also asserts that Deputy Warden Rodriguez engaged in retaliatory conduct in response to his complaints about his placement on administrative detention for nine days beginning on February 25, 2016. I construe those allegations as supportive of a First Amendment retaliation claim.

#### 1. Access to Courts

Garcia alleges that on February 25, 2016, after his placement on administrative detention pending an investigation, he asked Lieutenant Earley for permission to call his attorney or the Inmates' Legal Aid Services in New Haven, Connecticut. *See* Compl. at 14 ¶ 78. Later that day, Garcia asked Caption Rios for permission to call his attorney or the Inmates' Legal Aid Services. *See id.* at 17 ¶ 99. Neither Lieutenant Earley, nor Captain Rios would permit Garcia to make a

legal call on February 25, 2016.  *See id.* at 14 ¶ 78 & at 17 ¶ 99.

Garcia alleges that on March 2, 2016, Counselor Timbro indicated that he would "look into" the issue of granting Garcia permission to make a legal telephone call.  *See id.* at 25 ¶ 149. That afternoon, Counselor Supervisor Bowman allegedly "vowed to look into" the issue of granting Garcia permission to make a legal call.  *See id.* ¶ 150.  Garcia contends that he did not hear back from either Counselor Timbro or Counselor Supervisor Bowman at any time prior to his transfer to MacDougall-Walker on March 4, 2016.  *See id.* ¶¶ 149–50.

It is well settled that inmates have a First Amendment right of access to the courts.  *See Bounds v. Smith*, 430 U.S. 817, 828 (1977) *(modified on other grounds by Lewis v. Casey*, 518 U.S. 343, 350 (1996)).  To state a claim for denial of access to the courts, the plaintiff is required to demonstrate that he suffered an actual injury as a result of the conduct of the defendants.  *See Lewis*, 518 U.S. at 353.  To establish an actual injury, the plaintiff must allege facts showing that the defendant took or was responsible for actions that hindered his efforts to pursue a legal claim, prejudiced one of his existing actions, or otherwise actually interfered with his access to the courts.  *See Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997).

Garcia alleges that Lieutenant Earley and Captain Rios denied his request to make a telephone call to his attorney or to a legal services organization on two occasions on one day during his confinement on administrative detention.  Garcia does not indicate that he asked either official if he could make a legal call on another occasion.  With regard to Counselor Timbro and Counselor Supervisor Bowman, Garcia claims that they were both unsuccessful in facilitating his access to a legal telephone call during the three days prior to his transfer out of Enfield on March 4, 2016.

Garcia does not allege that he could not communicate with his attorney or the legal assistance organization in writing during his confinement on administrative detention. *See Ahlers v. Townsend*, 2014 WL 4365277, at *5 (N.D.N.Y. Aug. 28, 2014) ("Here, Plaintiff does not allege that he was denied the opportunity to communicate with his attorney altogether, but rather that his ability to communicate was sometimes delayed and intermittently denied. Conceivably, Plaintiff could have met with his attorney via mail or in person as well. As discussed above, his complaint is silent with regard to these other forms of communication. Plaintiff has thus not stated a First Amendment claim."); *Bellamy v. McMickens*, 692 F. Supp. 205, 214 (S.D.N.Y. 1988) (inmates have no right to unlimited telephone calls and there is no obligation to provide the "best manner of access to counsel"); *Pino v. Dalsheim*, 558 F. Supp. 673, 67–75 (S.D.N.Y. 1983) (finding that restrictions on telephone calls were permitted because inmate had unlimited opportunities to communicate with his attorney by written correspondence or personal visits, even though attorney's office was located over 300 miles from prison facility). Nor does he allege that his lack of access to an attorney or legal assistance via telephone on one day in February 2016 and on three days in March 2016 prejudiced a legal matter in any way. Accordingly, Garcia does not meet the injury requirement set forth in *Lewis*. *See Palmer v. Semple*, 2013 WL 6178530, at *3 (D. Conn. Nov. 21, 2013) ("Because plaintiff has failed to allege that he suffered an actual injury as a result of defendants' conduct in prohibiting him from making legal telephone calls in 2013, his access to courts claim fails to meet the standard set forth in *Lewis* . . . . [and is] dismissed pursuant to 28 U.S.C. § 1915A(b)(1)."). Garcia's claim regarding denial of access to legal telephone calls as asserted against Lieutenant Earley, Captain Rios, Counselor Timbro and Counselor Supervisor Bowman

is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

## 2. Retaliation

When prison officials take adverse action against an inmate, motivated by the inmate's exercise of a protected constitutional right, a Section 1983 retaliation claim may be sustained. *See Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000) ("In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws.").  The Second Circuit has observed, however, that retaliation claims asserted by inmates "are easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)).  Thus, courts must "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even though otherwise not rising to the level of a constitutional violation— can be characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (internal quotation marks and citations omitted).  To state a retaliation claim, a plaintiff must show that his conduct or speech was protected by the Constitution or federal law, prison officials took adverse action against him and the protected conduct or speech was a substantial or motivating factor in the alleged retaliatory or adverse action by prison officials.  *See Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citations and internal quotation marks omitted).

Garcia alleges that on March 4, 2016, in retaliation for his verbal complaints about being placed on administrative detention pending an investigation as of February 25, 2016, Deputy

Warden Rodriguez issued an order that he be transferred to MacDougall-Walker and also instructed Property Officer Valierre to confiscate his Nintendo 3DS XL game console and games as contraband. *See* Compl. at 27–28 ¶¶ 164–65. It is well-established that "the filing of prison grievances is a constitutionally protected activity . . . ." *Davis*, 320 F.3d at 352–53. Here, Garcia states that he asserted many verbal complaints to Deputy Warden Rodriguez and others regarding his improper placement on administrative detention for nine days beginning on February 25, 2016. Although, not all oral speech by an inmate constitutes protected activity, some courts within the Second Circuit have determined that oral complaints about the conduct of prison officials or conditions of confinement may constitute protected speech in the context of a First Amendment retaliation claim. *See McIntosh v. United States*, 2016 WL 1274585, at *26 (S.D.N.Y. Mar. 31, 2016) (collecting cases).

As stated above, an inmate has no right to be housed in a particular prison facility. *See Meachum*, 427 U.S. at 225 (no liberty interest arising from Due Process Clause itself in transfer from low-to maximum-security prison because "[c]onfinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose"); *Jarecke*, 552 F. Supp. 2d at 265 ("Inmates have no constitutionally protected right to be confined in any particular correctional facility or housing unit."). The Second Circuit has held, however, that the transfer of an inmate to another prison facility in response to that inmate's exercise of a protected right under the Constitution constitutes the necessary adverse action to state an actionable retaliation claim. *See Smith v. Levine*, 510 F. App'x 17, 21 (2d Cir. 2013) ("We had stated, at least as early as 1998, that, while '[a] prisoner has no liberty interest in remaining at a particular correctional facility,' prison authorities 'may not transfer an inmate in

retaliation for the exercise of constitutionally protected rights.'") (quoting *Davis v. Kelly,* 160

F.3d 917, 920 (2d Cir. 1998), and citing *Hendricks v. Coughlin,* 114 F.3d 390, 393–94 (2d Cir.

1997); *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir. 1987)). Garcia contends that Warden

Rodriguez threatened to transfer him to another facility and then issued the order to have him

transferred to MacDougall-Walker in retaliation for his oral complaints about his confinement on

administrative detention at Enfield.

In addition, courts within the Second Circuit have held that a prison official's decision to

confiscate or destroy an inmate's property might rise to the level of adverse conduct. *See*

*Deangelis v. Santiago,* 2016 WL 4467888, at *4 (D. Conn. Aug. 23, 2016) ("The plaintiff

contends that in retaliation for the grievances that he had submitted regarding tobacco use by

prison staff, Officer Lamotte was responsible for losing or confiscating his Nintendo machine,

games, headphones, and clothing and issuing him a false disciplinary report for possession of

contraband. The court concludes that these more detailed allegations state a plausible claim of

retaliation and will proceed."); *Marino v. Watts,* 2014 WL 1794588, at *6 (N.D.N.Y. May 6,

2014) ("A prison official's conduct in confiscating, losing, or destroying an

inmate's property may constitute an adverse action for purposes of a retaliation claim.") (citing

*Mateo v. Bristow,* 2013 WL 3863865, at *5 (S.D.N.Y. July 16, 2013) ("a plaintiff may prevail on

a retaliation claim by showing, *inter alia,* that prison officials intentionally or deliberately lost or

destroyed his property") (internal quotation marks and citation omitted). Garcia claims that more

than a year before his transfer to MacDougall-Walker, prison officials at Enfield had authorized

him to possess a Nintendo 3DS XL game console and games, even though another inmate had

given the items to him as a gift. Just before his transfer to MacDougall-Walker, however,

Deputy Warden directed the Property Officer to confiscate those items as contraband.

I conclude that Garcia has plausibly alleged that his oral complaints regarding his placement on administrative detention constituted protected speech and Deputy Warden Rodriguez retaliated against him for exercising that form of speech by transferring him to MacDougall-Walker, a more restrictive prison facility, and by directing Property Officer Valierre to confiscate his Nintendo 3DS XL game console and games, which had been previously approved as non-contraband items, prior to his transfer. Those retaliation claims will proceed against Deputy Warden Rodriguez.

###### H. State-Law Claim – Intentional Infliction of Emotional Distress

In his description of legal claims, Garcia contends that the defendants intended to inflict emotional distress upon him. He does not otherwise mention that state-law claim.

In Connecticut, a claim of intentional infliction of emotional distress requires a plaintiff to assert: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Reyes v. City of Bridgeport*, 152 Conn. App. 528, 543 n.13, (2014) (internal quotation marks and citation omitted). The initial determination "[w]hether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is for the court." *Id.* Conduct is considered to be "outrageous in character" and "extreme in degree" when it "exceeds all bounds usually tolerated by decent society." *Id.*

Garcia does not articulate any facts to support a claim of intentional infliction of

emotional distress.  I conclude that none of the conduct described in the complaint rises to the level of conduct that is sufficiently outrageous or extreme to be considered "atrocious" or "utterly intolerable in a civilized community."  *Id.*  Accordingly, Garcia has not stated a plausible state-law claim of intentional infliction of emotional distress against the defendants. The claim that the defendants intended to inflict emotional distress upon Garcia is dismissed.  *See* 28 U.S.C. § 1915A(b)(1).

**It is hereby ordered that:**

(1)     All claims against Trooper Stebbins and Commissioner Semple, all claims against the remaining defendants for violations of the Fifth and Eighth Amendments, the First Amendment access to courts claim against Lieutenant Earley, Captain Rios, Counselor Timbro and Counselor Supervisor Bowman, the Fourteenth Amendment property claim against Property Officer Valierre, the Fourteenth Amendment grievance procedures claim against Remedies Coordinators Bennett and Ortiz, the Fourteenth Amendment due process claims related to Garcia's level increase, placement in Administrative Detention, and transfer to MacDougall-Walker against all defendants and the state-law intentional infliction of emotional distress claim against all defendants are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1).  The First Amendment retaliation claims will proceed against Deputy Warden Rodriguez, the Fourth Amendment strip search claim will proceed Lieutenant Earley, and the Fourteenth Amendment due process claim related to Garcia's placement on high security status will proceed against Warden Ford and Deputy Warden Rodriguez.  Thus, all claims against defendants Commissioner Semple, District Administrator Quiros, Director of Classification and Population Management Maiga, Counselor Supervisors Vazquez, Weldon and Bowman, Counselor Timbro, Captains

Hunter and Rios, Lieutenants Kit, Lee, Montefusco and Scarchilli, Intelligence Coordinator Rodriguez, Investigator Gogglieb, Administrative Remedies Coordinators Bennett and Ortiz, Property Officer Valierre, Correctional Officers Atkins and Hazelett, Connecticut State Trooper Stebbins, and K-9 Handler Jane Doe have been **DISMISSED**.

(**2**)     Within twenty-one (21) days of this Order, the Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshal's Service.  The U.S. Marshals Service shall serve the summons, a copy of the complaint and this order on Warden Walter Ford, Deputy Warden Nick Rodriguez and Lieutenant Earley in their official capacities by delivering the necessary documents in person to the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141.

(**3**)     Within twenty-one (21) days of this Order, the Clerk shall prepare and mail a copy of the complaint, this order and a waiver of service of process request packet each of the following defendants in his or her individual capacities: to Warden Walter Ford, Deputy Warden Nick Rodriguez and Lieutenant Earley, at his or her current work.  On the thirty-fifth (35th) day after mailing, the Clerk shall report to the court on the status of each request.  If any defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(**4**)     Warden Ford, Deputy Warden Rodriguez and Lieutenant Earley shall file their response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.  If the defendants choose to file an answer, they shall admit or deny the allegations and respond to the

cognizable claims recited above.  They may also include all additional defenses permitted by the Federal Rules.

(5)      Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within six months (180 days) from the date of this order.  Discovery requests need not be filed with the court.

(6)      All motions for summary judgment shall be filed within seven months (210 days) from the date of this order.

(7)      If Garcia changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that Garcia MUST notify the court.  Failure to do so can result in the dismissal of the case.  Garcia must give notice of a new address even if he is incarcerated.  Garcia should write PLEASE NOTE MY NEW ADDRESS on the notice.  It is not enough to just put the new address on a letter without indicating that it is a new address.  If Garcia has more than one pending case, he should indicate all of the case numbers in the notification of change of address.  Garcia should also notify the defendants or the attorney for the defendants of his new address.

(8)      The *Pro Se* Prisoner Litigation Office shall send a courtesy copy of the complaint and this order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

So ordered.

Dated at Bridgeport, Connecticut, this 30th day of October 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge